IN THE UNITED STATES DISTRICT COURT FOR
THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

|  |  |
|---|---|
| VERONICA L. MARTIAN,<br>            *Plaintiff*,<br><br>        v.<br><br>NANCY A. BERRYHILL,<br>Acting Commissioner,<br>Social Security Administration,<br>            *Defendant.* | Civil Action No. 1:18-cv-12-LMB-MSN |

## REPORT AND RECOMMENDATION

This matter is before the Court on the parties' cross motions for summary judgment (Dkt. Nos. 14, 15). Pursuant to 42 U.S.C. § 405(g) and acting *pro se*, Plaintiff appeals the Acting Commissioner's determination that she is not entitled to receive decedent's lump sum death benefits as his widow, and asks the Court to reverse the Commissioner's decision and "declare her the legal widow under Section 202(e) & 216(c) [of] the Social Security Act." Pl.'s Mot. for Summ. J. at 2 (Dkt. No. 14). Defendant argues that "the Commissioner's final decision is supported by substantial evidence in the record and sound legal analysis," and therefore should be affirmed. Def.'s Mem. in Supp. 20-21 (Dkt. No. 16). For the reasons that follow, the undersigned recommends granting Plaintiff's motion for summary judgment in part, denying Defendant's motion for summary judgment, and remanding the Commissioner's final decision for reconsideration in accordance with the legal standards articulated herein.

## I.    Procedural Background

On August 1, 2014, Plaintiff Veronica Martian applied for a lump-sum death benefit, claiming that she was the widow of deceased worker Robert S. Rigby. Tr. 50-51 (Ex. 12);

Tr. 52-55 (Ex. 13) (representing that Plaintiff and decedent began living together in a husband and wife relationship in January 1980 in Falls Church, Virginia, and that decedent gave her a wedding band after returning home from his mother's funeral in South Carolina). In her application, Plaintiff submitted a letter from decedent's three siblings, affirming their view that she was their brother's "common law wife" and that they "[had] always respected and supported" the union. Tr. 49 (Ex. 11) (Letter from Elizabeth Rigby Berry, Harrison Montgomery Rigby, and Haliburton Powe Rigby, dated July 14, 2014). Because Virginia does not recognize common-law marriage, and Plaintiff conceded that she and decedent had never resided anywhere other than in Virginia, Tr. 58 (Ex. 15), the Social Security Administration ("SSA") denied Plaintiff's claim for failure to establish a marital relationship. Tr. 59. Plaintiff was informed of the denial of her application on August 10, 2014, Tr. 60-61 (Ex. 16).

Plaintiff submitted an application for reconsideration on September 23, 2014, in which she attached a letter stating that she and decedent were married in South Carolina in 2000.[1] Tr. 68. Specifically, she stated that decedent asked Plaintiff to be his wife and presented her with a ring during a visit to South Carolina for his father's funeral. Tr. 67; *see also* Tr. 179 (decedent's brother testifying that he was not in attendance but learned of Plaintiff's ceremony with decedent in South Carolina from his sister). Plaintiff also stated that she and decedent stayed with his sister and brother-in-law in South Carolina on three occasions in 2000-2001, and spent time visiting other relatives in Greenville, South Carolina, where decedent was raised. Tr. 68-69; *see also* Tr. 152 ("The wage earner had more than eighteen years of residency in the State of [South] Carolina."). Plaintiff notes that she and decedent stayed together in a guest bedroom for a total of fifteen days across the three visits. Tr. 69. She further relays that

---

[1]     The undersigned notes that there are inconsistencies in the evidence presented by the Plaintiff as to when, if ever, and where, she and decedent entered into a marriage contract. However, it is for the ALJ, and not this Court, to resolve any inconsistencies in the record.

she attended her high school reunion in September 2007 in Pennsylvania, where she introduced decedent as her husband.  *Id.*  Plaintiff's application for benefits was denied upon reconsideration on December 24, 2014.  Tr. 85-88 (Ex. 19).

On January 15, 2015, Plaintiff requested a hearing before an administrative law judge ("ALJ"), which took place on June 23, 2016.  Plaintiff appeared at the hearing *pro se*.  Tr. 171-181.  At the hearing, the ALJ asked if Plaintiff was "arguing that there is no domicile requirement for . . . South Carolina to have a common law marriage."  Tr. 175.  Plaintiff affirmed, testifying that though she and decedent did not live in South Carolina, they had a ceremony there with family and she was introduced there to elderly family members as his wife.  Tr. 175-77.  She further stated that while she was not listed on the lease or utilities, she and decedent were jointly listed on their car and renter's insurance policies.  Tr. 177.

Harrison Rigby, decedent's brother, also testified at the hearing.  Tr. 179-180.  Mr. Rigby lived with decedent and Plaintiff for seven years in their Virginia home, from 2007 to 2014.  Tr. 47 (Ex. 47).  He noted that he was aware of Plaintiff's South Carolina ceremony with decedent, but was not in attendance.  Tr. 179.  He further testified that in his view, Plaintiff and decedent held themselves out as a married couple and behaved as such, "commit[ing] themselves to each other in word and in deed."  *Id.*

On August 9, 2016, the ALJ issued a decision finding that Plaintiff "was not the widow of the wage earner within the meaning of the Social Security Act at any time through the date of this decision."  Tr. 11.  Specifically, the ALJ concluded that, "because Virginia does not recognize common law marriage and the claimant and wage earner did not have a valid South Carolina common law marriage, the claimant is not entitled to receive lump sum death benefits as a widow."  Tr. 16.  In support of her conclusion that Plaintiff did not have a valid common-

law marriage in South Carolina, the ALJ made two findings: (1) Plaintiff and decedent spent only brief amounts of time in South Carolina and thus "there could not have been long term social acceptance of the couple as married in South Carolina," and (2) because Plaintiff and decedent were in South Carolina "for only short periods" and had "no clear intent to remain in South Carolina and cohabit," Plaintiff had not submitted "clear and convincing evidence" proving that a common law marriage under South Carolina law existed.  Tr. 15-16.

Plaintiff sought review of the ALJ's decision by the Appeals Council, which declined to review the case on November 3, 2017.  Tr. 3-5.  This appeal followed.

## II.    Legal Standard

In reviewing a decision of the Commissioner, the court is limited to determining whether the Commissioner's decision was supported by substantial evidence on the record, and whether the proper legal standard was applied in evaluating the evidence.  *See* 42 U.S.C. § 405(g); *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990).

Substantial evidence "consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance."  *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966).  When evaluating whether the Commissioner's decision is supported by substantial evidence, "it is not within the province of a reviewing court to determine the weight of the evidence, nor is it the court's function to substitute its judgment for that of the Secretary."  *Hays*, 907 F.2d at 1456.  "Ultimately, it is the duty of the administrative law judge reviewing a case, and not the responsibility of the courts, to make findings of fact and to resolve conflicts in the evidence."  *Id.* (citing *King v. Califano*, 599 F.2d 597, 599 (4th Cir. 1979)).  If supported by substantial evidence, the Commissioner's findings as to any fact are conclusive and must be affirmed.  *See* 42 U.S.C. § 405(g); *Richardson v. Perales*, 402 U.S. 389, 401 (1971).

4

However, "this court is not so restrained in determining whether correct legal standards were applied." *Hines v. Bowen*, 872 F.2d 56, 58 (4th Cir. 1989) (citing *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987)).  "A factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." *Coffman*, 829 F.2d at 517.  Failure to follow the correct legal standards is grounds for reversal.  *See id.*

## III.  Analysis

The ALJ's decision that Plaintiff is not entitled to receive lump sum death benefits as a widow rests on her conclusions that a common-law marriage does not exist in either Virginia or South Carolina.  The parties do not dispute that the Commonwealth of Virginia does not recognize common-law marriage.  *See Offield v. Davis*, 40 S.E. 910, 911 (Va. 1902); *see also* Pl.'s Mem. in Supp. at 15 (Dkt. No. 20) ("plaintiff never claimed that common law marriage vows occurred in the State of Virginia").  However, Virginia "does extend comity to such unions 'valid under the laws of the jurisdiction where the common-law relationship was created.'" *Kelderhaus v. Kelderhaus*, 467 S.E.2d 303, 305 (Va. Ct. App. 1996) (quoting *Farah v. Farah*, 429 S.E.2d 626, 629 (Va. Ct. App. 1993)); *accord Metro. Life Ins. Co. v. Holding*, 293 F. Supp. 854, 857 (E.D. Va. 1968) ("Although common law marriages are void in Virginia if celebrated there, they will be recognized by Virginia if consummated in a state where valid and are between parties not forbidden to marry under Virginia law.").

Thus, as addressed below, the legal issue before the ALJ was whether Plaintiff had a valid common-law marriage in South Carolina.  In addition, the undersigned addresses Defendant's alternative argument that even if Plaintiff had a valid common-law marriage in

South Carolina, Virginia would not recognize such a marriage. Finally, Plaintiff's argument that the ALJ erred in allegedly barring the testimony of one of her witnesses is also addressed.[2]

### A.   Common-Law Marriage in South Carolina

The ALJ concluded that Plaintiff had not presented clear and convincing evidence of a valid common-law marriage in South Carolina based on two findings: (1) lack of "long term social acceptance of the couple as married in South Carolina," and (2) a lack of a "clear intent to remain in South Carolina and cohabit." Tr. 15-16. For the reasons discussed below, the undersigned finds that the ALJ applied incorrect legal standards in making each determination.

As a preliminary matter, Defendant notes an apparent tension within South Carolina case law regarding whether the validity of a common-law marriage is a question of law or fact. *See* Def. Mot. for Summ. J. at 12, n.1 (comparing *Callen v. Callen*, 620 S.E.2d 59, 62 (S.C. 2005) ("Whether a common-law marriage exists is a question of law."), *with Barker v. Baker*, 499 S.E.2d 503, 508 (S.C. Ct. App. 1998) ("whether a common law marriage exists is a question of fact")). The undersigned does not view these cases to be in conflict. The issue of whether a question is one of fact or law "is not analytic, but allocative: what decisionmaker should decide the issue?" Henry P. Monaghan, *Constitutional Fact Review*, 85 Colum. L. Rev. 229, 237 (1985).

In the instant case, a common-law marriage determination is a question of fact insofar as the ALJ must engage in fact-finding to determine whether the evidence presented overcomes the burden of proof and meets the requisite elements, subject only to a sufficiency of the evidence

---

[2]     Plaintiff additionally argues that the ALJ failed to consider each piece of evidence. *See, e.g.*, Pl.'s Mot. for Summ. J. at 6, 9 (Dkt. No. 13). However, "there is no rigid requirement that the ALJ specifically refer to every piece of evidence in [her] decision." *Reid v. Comm'r of Soc. Sec.*, 769 F.3d 861, 865 (4th Cir. 2014) (quoting *Dyer v. Barnhart*, 395 F.3d 1206, 1211 (11th Cir. 2005)). Moreover, an analysis of the evidence the ALJ did or did not consider is unnecessary where, as here, the undersigned recommends remanding the case for the ALJ's reconsideration in accordance with the legal standards articulated herein.

standard of review.  However, a common-law marriage determination is a question of law insofar as the ALJ must weigh her factual findings against the correct legal standards established under South Carolina case law; errors of law are subject to reversal or remand.  *See Coffman*, 829 F.2d at 517.

The legal standards defining common-law marriage in South Carolina are set forth as follows.  Under South Carolina law, "[a] common-law marriage is formed when two parties contract to be married."  *Callen*, 620 S.E.2d at 62; *see also Johnson v. Johnson*, 112 S.E.2d 647, 651 (S.C. 1960) ("It is essential to a common law marriage that there shall be a mutual agreement between the parties to assume toward each other the relation of husband and wife. Cohabitation without such an agreement does not constitute marriage."); *Barker*, 499 S.E.2d at 506-07 ("In South Carolina, a common-law marriage exists if the parties intend to enter into a marriage contract."); *Rodgers v. Herron*, 85 S.E.2d 104, 113 (S.C. 1954) (a common law marriage "depends upon facts and circumstances evidencing a mutual agreement to live together as husband and wife, and not in concubinage"); *Owens v. Owens*, 466 S.E.2d 373, 375 (S.C. Ct. App. 1996); *see also* 52 Am. Jur. 2d Marriage § 42 (1970) ("At common law no formal ceremony is essential to a valid marriage, and an agreement between the parties per verba de praesenti—that is, by words of the present tense, or a present agreement—to be husband and wife constitutes a valid marriage; no other ceremony is necessary.").

To determine whether a common-law marriage exists, the fact-finder must "look for mutual assent: the intent of each party to be married to the other and a mutual understanding of the party's intent.  Consideration is the participation in the marriage.  If these factual elements are present, then the court should find *as a matter of law* that a common-law marriage exists."  *Callen*, 620 S.E.2d at 62 (emphasis added).  The intent of both parties to enter into a

marriage contract is "usually evidenced by a public and unequivocal declaration by the parties." *Cathcart v. Cathcart*, 414 S.E.2d 811, 812 (S.C. Ct. App. 1992).  When a common-law marriage is founded on "an express contract, there will be less difficulty in ascertaining the fact, for there the evidence will refer to a particular transaction, and nothing is to be determined but its effect." *Lucken v. Wichman*, 5 S.C. 411, 413-14 (1874).

Often, however, "[d]irect evidence of the requisite intent . . . may not be readily available.  Thus, the existence of a common-law marriage frequently is proved by circumstantial evidence."  *Barker*, 499 S.E.2d at 507 (citations omitted); *Kirby v. Kirby*, 241 S.E.2d 415, 416 (1978) ("[t]he intent in marriage is usually evidenced by a public and unequivocal declaration of the parties, but that is not necessary"); *Callen*, 620 S.E.2d at 62 ("No express contract is necessary; the agreement may be inferred from the circumstances.").  Examples of the types of circumstantial evidence "typically" relied upon include "evidence establishing that the parties have lived together for an extended period of time and have publicly held themselves out as husband and wife."  *Barker*, 499 S.E.2d at 507.  When proving a common-law marriage through circumstantial evidence, the party claiming the marriage must establish the same by a preponderance of the evidence standard.  *Ex parte Blizzard*, 193 S.E. 633, 635 (S.C. 1937).  However, in cases where one party is deceased, a common-law marriage must be established by "clear and convincing evidence."  *See* S.C. Code Ann. § 62-2-802(b)(4) (2009).

South Carolina courts have further held that in some cases, circumstantial evidence can give rise to a rebuttable presumption of a common-law marriage:

> Thus, if a party claiming a common-law marriage presents proof of apparently matrimonial cohabitation and long-term social acceptance of the couple as married, a presumption arises that the couple entered into a common-law marriage, notwithstanding the absence of any proof of an express agreement to enter into a common-law marriage.  The presumption, however, in no way

> lessens the claimant's burden of proving a common-law marriage
> by the preponderance of the evidence.  Instead, the presumption
> simply designates the facts that, if proven to the satisfaction of the
> fact-finder, will be sufficient to establish a common-law marriage
> unless properly rebutted.

*Barker*, 499 S.E.2d at 507 (citations omitted).  Indeed, in the seminal South Carolina case articulating this presumption of marriage, *Jeanes v. Jeanes*, evidence triggering the presumption was so strong that even both parties' *denial* of marital intent was not sufficient to overcome it. 177 S.E.2d 537 (S.C. 1970).

In *Jeanes*, the Supreme Court of South Carolina affirmed the termination of former husband's alimony obligations based on appellant former wife's subsequent cohabitation with another man for more than two years.  *See id.* at 538.  The court found that appellant's lengthy cohabitation with Mr. Swygert post-divorce, combined with facts establishing social acceptance of their relationship (*e.g.*, city directories listing them as husband and wife and Mr. Swygert listing appellant as his wife on employer records, tax returns, and his life insurance policy), was clearly sufficient to support a finding of a common-law marriage, despite appellant's and Mr. Swygert's denial of remarriage.  *Id.* at 539 ("There is a strong presumption in favor of marriage by cohabitation, apparently matrimonial, coupled with social acceptance over a long period of time.").  While this presumption is ordinarily rebuttable, "the degree of proof to overcome it is generally very high."  *Id.* (quoting 52 Am. Jur. 2d Marriage § 132 (1970)); *see also Owens v. Owens*, 466 S.E.2d at 375 (finding that the presumption of marriage was not overcome by one party's apparent admission of nonmarriage); *Callen*, 620 S.E.2d at 62 ("This presumption [of common-law marriage] may be overcome by 'strong, cogent' evidence that the parties in fact never agreed to marry.").

While it is within the province of the ALJ to decide, as a factual matter, whether Plaintiff and decedent did in fact have a common-law marriage, the ALJ "must weigh such facts as it finds against a proper legal standard." *Mott v. Duncan Petroleum Trans*, 414 N.E.2d 657 (N.Y. Ct. App. 1980) (finding that the Workers Compensation Board erroneously applied too stringent a legal standard in determining whether a common-law marriage existed under Georgia law). "If an improper legal standard was used, review of the fact-finding process is impossible." *Id.* Based upon the foregoing review of South Carolina case law on common-law marriage, the undersigned finds that the ALJ's determination of Plaintiff's marital status was premised upon erroneous views of applicable law, as described below.

### 1.      Long Term Social Acceptance

In her decision, the ALJ cites language in *Barker* setting forth the presumption of marriage, 499 S.E.2d at 507 (discussed *supra* p. 8), then concludes that Plaintiff and decedent did not have a common-law marriage because they "spent only brief amounts of time in South Carolina" and therefore "there could not have been the long term social acceptance of the couple as married in South Carolina." Tr. 15. To support her finding, the ALJ also relies on a legal opinion by a regional chief counsel of the Social Security Administration, which found no common-law marriage because the parties' brief visits to South Carolina could not create long-term social acceptance of the couple in South Carolina. *See* Tr. 15 (citing PR 05610.045, *available at* https://secure.ssa.gov/apps10/poms.nsf/lnx/1505610045) (January 9, 2003). Both the ALJ, and the chief counsel to whom she cites, misapply *Barker* and conflate facts required to establish a common-law marriage with those required to establish a rebuttable presumption of marriage.

As noted above, South Carolina case law references "long term social acceptance" in the context of establishing a *rebuttable presumption* of marriage. Though this presumption is refutable, it requires a high degree of proof to overcome. *See Jeanes*, 177 S.E.2d at 540. Importantly, "apparently matrimonial cohabitation" and "long-term social acceptance" are not required to prove the existence of a common law marriage; they are required to trigger the presumption of a common-law marriage. *See Barker*, 499 S.E.2d at 507; *Jeanes*, 177 S.E.2d at 539. The ALJ misunderstands this distinction. By definition, a rebuttable presumption, once triggered, shifts the burden of proof from one party to the other. By applying an incorrect legal standard, the ALJ imposed too high a burden of proof on the Plaintiff.

Moreover, while community recognition and reputation can be used as circumstantial evidence to demonstrate an intent to be married—and, in cases where the recognition and cohabitation occurs over a long period of time, can give rise to a presumption of marriage—the only *required* elements to prove a common-law marriage in South Carolina are mutual assent (*i.e.*, the intent to be married and a mutual understanding of the other party's intent) and consideration (*i.e.*, participation in the marriage). *See Callen*, 620 S.E.2d at 62; *accord Grossman v. Gangel*, 192 A.D.2d 396, 398 (N.Y. App. Div. 1993) ("[m]utual agreement is the essential element" of South Carolina common-law marriages) (citing *Johnson*, 112 S.E.2d at 651). Where these factual elements are present, "the court should find as a matter of law that a common-law marriage exists." *Callen*, 620 S.E.2d at 62.

It is not for this Court to determine whether the record supports a finding of a common-law marriage under the proper legal standard; this question must be decided by the ALJ. Accordingly, the undersigned recommends remanding the case for the ALJ to consider whether

sufficient evidence exists to establish a mutual marital agreement in the State of South Carolina, under the standards articulated herein.

### 2.      Intent to Remain and Cohabit in South Carolina

The second reason the ALJ declined to find a valid common-law marriage was because Plaintiff and decedent were in South Carolina "for only short periods" and had "no clear intent to remain in South Carolina and cohabit." Tr. 15-16; *see also* Tr. 175 (asking Plaintiff at the hearing if she was "arguing that there is no domicile requirement for . . . South Carolina to have a common law marriage").  In support of the ALJ's finding, Defendant argues that "taking *Callen* and *Barker* together, South Carolina requires that a couple actually reside in South Carolina *and* hold themselves out as married over a prolonged period" in order to be deemed married under common law.  Def. Mot. for Summ. J. at 13.  Defendant misinterprets the rulings in both *Barker* (as discussed above) and *Callen*.

In *Callen*, the Supreme Court of South Carolina held that no common-law marriage may be formed when there is an impediment to marriage.  *Callen*, 620 S.E.2d at 62.  Moreover, after the impediment is removed, the relationship remains non-marital until and unless there is a "new mutual agreement" to enter into a common-law marriage.  *Id.* (citing *Kirby*, 241 S.E.2d at 416). The parties in *Callen*, Sean and Page, agreed that their relationship began in Florida, but disputed most other relevant facts.  Sean alleged that he lived subsequently in New York, Massachusetts, and Ireland, on his own; Page alleged that she lived with him.  Page claimed that she eventually moved to South Carolina and that Sean lived there with her; Sean denied this, claiming that he maintained a residence only in Georgia.  *Id.* at 61-62.

Whether both parties actually resided together in South Carolina was not relevant to the court's analysis:

12

> Even assuming, as Page urges, that the parties lived together in Florida, New York, Massachusetts, and Ireland, and further assuming that they moved together from Florida to South Carolina in August 2000, no common-law marriage could have been formed, if at all, until after the move.  Since none of those other jurisdictions sanctions common-law marriages, there was an impediment to marriage until the parties took residency [in South Carolina].  It must be presumed that Sean and Page's relationship remained non-marital after the move, after the impediment disappeared.

*Id.* at 63.  In other words, the court assumed—without resolving the dispute as to—residency in South Carolina to make the point that, of all the jurisdictions in which the parties allegedly lived, only South Carolina would permit even the possibility of a common-law marriage.  Thus, the parties had the burden of proving that they entered into a new marital agreement after moving to South Carolina.  *Id.*; *see also Kirby*, 241 S.E.2d at 416 ("After the barrier to marriage has been removed there must be a new mutual agreement either by way of civil ceremony or by way of . . . a new agreement to enter into a common-law marriage.") (citations omitted).  By improperly considering "the parties' conduct prior to coming to South Carolina," and by failing to require the parties to establish a new marital agreement in South Carolina, the lower court erred.  *Id.* (reversing and remanding for new hearing).  Applying *Callen*, the ALJ cannot consider Plaintiff's prior conduct in Virginia in determining whether, upon reaching South Carolina, Plaintiff and decedent entered into a new, marital agreement.

However, the undersigned does not interpret *Callen* as imposing a residency requirement on the establishment of a common-law marriage in the state.  As noted above, although one of the parties in *Callen* denied being a South Carolina resident, the Court did not address this issue in its ruling or state that residency is a prerequisite to a common-law marriage in South Carolina.[3]  In declining to impose a residency requirement, South Carolina is not alone.  For

---

[3]     This appears consistent with South Carolina statutes regarding eligibility for marriage.  Parties seeking to

example, "[n]either Florida nor Ohio prescribes any minimum or maximum periods of residence as man and wife as a prerequisite to the creation of a common law marriage." *Metro. Life Ins. Co. v. Holding*, 293 F. Supp. 854, 857 (E.D. Va. 1968).[4]

Nor does there appear to be any minimum cohabitation requirement under South Carolina case law. *See Parker v. Parker*, 265 S.E.2d 237, 240 (N.C. Ct. App. 1980) ("find[ing] no South Carolina authority requiring a minimum period of cohabitation within the State for establishment of a common law marriage"); *Tarnowski v. Lieberman*, 560 S.E.2d 438, 440 (S.C. Ct. App. 2002) (affirming lower court's finding of a South Carolina common-law marriage despite the "brief time these parties cohabited"); *Estate of Judith E. Zinn*, 1989 LEXIS 5573, *6 (Sur. Ct. N.Y. 1989) (finding that a stopover in a South Carolina motel was sufficient to establish a common law marriage in that state because "petitioner and decedent cohabited, held themselves out as husband and wife, and participated in activities as a family unit"); *Grossman*, 192 A.D.2d at 398 (finding that, "[e]ven allowing that a two-night stay in South Carolina in the course of an automobile trip to Florida provides a sufficient basis upon which to establish a common-law marriage," the evidence did not establish the requisite intent to assume marital status); *accord Metro. Life Ins. Co.*, 293 F. Supp. at 857 (noting cases upholding common-law marriages in

---

obtain a license to marry in South Carolina must meet several requirements, but residency in the state is not one of them. *See* S.C. Code Ann. § 20-1-230. The statute codifying the recognition of common law marriages in South Carolina also does not specify a residency requirement. *Id.* § 20-1-360 ("Nothing contained in this article shall render illegal any marriage contracted without the issuance of a license.").

[4]     The Social Security Administration's own program operations manual acknowledges that a common-law marriage can arise in some states "from a temporary stay within the state's borders, if accompanied by holding out as husband and wife, even though the parties were never domiciled in that state." *SSA-POMS: GN 00305.075*, "State Laws on Validity of Common-Law (Non-Ceremonial) Marriages" (*available at* http://policy.ssa.gov/poms.nsf/lnx/0200305075). The guidance provides a "digest" of state laws regarding the recognition of common-law marriage, noting, *e.g.*, that temporary stays by nonresidents do not establish common-law marriages in Colorado, Oklahoma, or Texas, but that no evidence of cohabitation is required to prove a common-law marriage in Iowa, Kansas, or New Jersey. *Id.* While the accuracy of this compilation is unverified (indeed, it fails to list Virginia as a state that recognizes common-law marriages validly contracted in other states), it is noted that the SSA's own operations manual does not ascribe any residency or domicile requirement to South Carolina.

Florida, Ohio, Oregon, Alabama, and Georgia despite brief visits by nonresidents) (citations omitted); *Mott*, 414 N.E.2d at 659 (finding reversible error where lower court "assumed that a mere 'visit' to Georgia could not result in a valid Georgia marriage").

In *Parker v. Parker*, the North Carolina Court of Appeals reversed on the basis that the evidence did not support the trial court's conclusion that the parties had not formed a valid South Carolina common-law marriage.  265 S.E.2d at 239.  The plaintiff and defendant in this case married in South Carolina in 1956, but moved to North Carolina in 1961.  However, plaintiff did not obtain a divorce from her first husband until 1972, rendering her 1956 marriage to defendant void under South Carolina law.  *See id.* (citing S.C. Code Ann. § 20-1-80) ("All marriages contracted while either of the parties has a former wife or husband living shall be void.").  It was undisputed that the parties had not participated in a marriage ceremony since the 1972 divorce, but plaintiff testified that subsequent to the divorce she and defendant stayed in South Carolina for six weeks as husband and wife.

The appellate court found "ample evidence in support of the trial court's finding that both parties [had] surrendered their South Carolina residence and become residents of North Carolina," but held that the parties' lack of South Carolina residence "[was] not controlling."  *Id.* Indeed, finding no South Carolina authority requiring a minimum cohabitation period to establish a common-law marriage, the court noted that "in general, where establishment of the relationship is dependent upon an agreement between the parties to act toward one another as husband and wife, no such minimum period of cohabitation has been required."  *Id.* (citing *Bloch v. Bloch*, 473 F. 2d 1067 (3rd Cir. 1973) (agreement to be husband and wife during three-day vacation to jurisdiction recognizing common law marriage sufficient to establish the existence of such marriage)).  Because "plaintiff and defendant could have contracted a common law

15

marriage in South Carolina during that [six-week] period," despite being residents of North Carolina at the time, the court remanded for further proceedings consistent with the court's opinion. *Id.*

In sum, South Carolina case law does not establish a minimum residency or cohabitation requirement to contract a common-law marriage; instead, mutual agreement is the essential element. *See Johnson*, 112 S.E.2d at 651; *Grossman*, 192 A.D.2d at 398. Based on the foregoing, the undersigned finds that the ALJ applied an incorrect legal standard when she declined to find a valid common-law marriage because Plaintiff and decedent were in South Carolina "for only short periods" and had "no clear intent to remain in South Carolina and cohabit," and recommends remand for reconsideration consistent with South Carolina legal standards.

### B.  Recognition of South Carolina Common-Law Marriage in Virginia

Defendant argues that even if Plaintiff had a valid marriage under South Carolina law, Virginia would still not recognize their marriage. Def. Mot. for Summ. J. at 14. Noting that Virginia extends comity to common-law marriages formed in other jurisdictions "only when the result would not be 'repugnant to Virginia public policy,'" *Kelderhaus v. Kelderhaus*, 467 S.E.2d 303, 305 (Va. Ct. App. 1996) (citations omitted), Defendant argues that "such a public policy exists against recognition of alleged out-of-state common-law marriages based on short durations spent in that other state." Def. Mot. for Summ. J. at 14. However, *Kelderhaus* provides no support for such a proposition.[5]

---

[5]     Indeed, as discussed *infra* p. 17-19, Virginia case law contradicts the Defendant's argument. *See Metro. Life Ins. Co.*, 293 F. Supp. at 857 (noting that "[t]he public policy of Virginia is to uphold the validity of a marriage if at all possible" and upholding common-law marriages formed by Virginia residents during brief stays in Florida and Ohio).

In *Kelderhaus*, the court was referring to a union that was "bigamous and void as a matter of law."[6]  467 S.E.2d at 304 ("Bigamous marriages 'confer no legal rights' and are 'contrary to the laws of Virginia and [its] public policy.'") (citations omitted).  After noting that Virginia does extend comity to "valid" common-law marriages formed in other states, the court then examined whether the parties had entered into such a union in either Texas or Oklahoma.

The parties in *Kelderhaus* obtained a marriage license in California in 1992, at which time the husband knowingly misrepresented that his previous marriage had been dissolved.  After ostensibly marrying in California, the parties moved to Arizona, where the husband obtained a divorce decree from his former wife.  The parties participated in a second marriage "ceremony" that was not a legal ceremony in Arizona, and thereafter moved to Virginia, driving cross-country and stopping in Texas and Oklahoma "overnight."[7]  *Id.*  The wife claimed that the impediment to marriage (*i.e.*, the husband's previous marriage) was removed by the Arizona divorce decree, and that the couple's ensuing relationship as husband and wife during their passage through Texas and Oklahoma—both common-law marriage jurisdictions—resulted in marriage.  *Id.* at 305.

The court first examined Texas law codifying common-law marriage, which requires that the parties prove that "they agreed to be married, and after the agreement they lived together *in this state* as husband and wife and *there* represented to others that they were married."  *Id.* (citing Tex. Fam. Code Ann. § 1.91(a)(2) (West 1996)) (emphasis added).  The court found no evidence in the record that the parties met these requirements when the stopped in Texas overnight.  *Id.*

---

[6]     *See* Va. Code Ann. § 20-38.1 (enumerating prohibited marriages, *e.g.*, bigamous or incestuous marriages).

[7]     Defendant incorrectly states that the parties made "trips of a few days to Oklahoma and Texas."  Def. Mot. for Summ. J. at 15.

Turning to Oklahoma, the court relied on an Oklahoma Supreme Court case that enumerated four factors that must be present in order to prove a common-law marriage in that state.  *Id.*; *see Stinchcomb v. Stinchcomb*, 674 P.2d 26, 29 (Okla. 1983) (requiring an actual and mutual agreement; a permanent relationship; an exclusive relationship, proved by cohabitation; and publicly holding out as husband and wife).  The court acknowledged that no Oklahoma authority requires that mutual representation occur within the state, but was persuaded by authorities in other jurisdictions that this element must be satisfied within Oklahoma.  *Id.* (citations omitted).  Applying relevant Oklahoma case law, and noting that the record contained "no evidence of specific conduct or representations by the parties, as husband and wife, in [Oklahoma]," the court held that "[t]o sanction a marriage arising from such an insignificant nexus with the common-law state would . . . ignore the principles which govern such unions *in Oklahoma*."  *Id.*  (emphasis added).

The facts in *Kelderhaus* are distinguishable from the instant case.  *Kelderhaus* addressed whether an overnight stop in either Texas or Oklahoma during a cross-country road trip presented a sufficient basis to establish a common-law marriage under the respective laws of those states.  It did not examine South Carolina case law or the more substantial nexus to the common-law marriage state at issue here, and, more importantly, did not state that establishing a common-law marriage during a brief stop-over is repugnant to Virginia's public policy.  If, as Defendant contends, "out-of-state common-law marriages based on short durations spent in that other state" were against Virginia's public policy, there would have been no need for the court in *Kelderhaus* to analyze whether a common-law marriage had been formed under Texas or Oklahoma law.

Indeed, Defendant's contention is contradicted by an Eastern District of Virginia case.  In *Metro. Life Ins. Co. v. Holding*, Robert and Lynn Holding married in France in April 1946, not realizing that Robert's pending divorce was not finalized until the following month. 293 F. Supp. at 856.  The parties lived together as husband and wife from the date of the French ceremony until Robert's death, at which time he was a resident of and domiciled in the State of Virginia.  *Id.*  The parties lived in Europe from 1946 to 1958, then in Virginia for a few months before moving to Laos, where they lived until 1966.  Thereafter the family returned to Virginia and bought a home in Annandale, where they remained until Robert's death in 1967.  *Id.*  While living in Virginia in 1958, the parties, "holding themselves out as husband and wife, visited friends in various parts of the United States, including a two-week stay in Florida."  *Id.*  During their posting in Asia from 1958-1966, the parties would often return to the United States on leave and visit friends all over the country, including one-month-long stays in Florida and Ohio, respectively, in 1961.  *Id.* at 856-57.

The court, after noting that neither Florida nor Ohio required a minimum period of residency to establish a common-law marriage, discussed several other cases in which minimal stays in a common-law marriage jurisdiction were sufficient to establish a marital contract:

> It was held in *Albina Engine and Machine Works v. O'Leary*, 9[th] Cir., 328 F.2d 877 (1964), that annual weekly visits to Idaho from Oregon were sufficient.  Tennessee, in *Madewell v. United States, D.C.*, 84 F. Supp. 329 (1949), held that cohabitation for a number of days by non-domiciliaries in Alabama was sufficient to establish a common law marriage after the removal of an existing impediment.  See also *Ventura v. Ventura*, 53 Misc.2d 881, 280 N.Y.S.2d 5 (1967), where cohabitation for three days by a New Yorker while visiting in Georgia was sufficient to establish a common law marriage after the removal of an existing impediment.

*Id.* at 857.  Relying on these cases, the court concluded that a valid common law marriage was consummated between the parties "by virtue of their living together as man and wife in Florida and in Ohio during 1961 and by holding themselves out as such thereafter wherever they lived." *Id.* at 858.  In so doing, the court noted that "[t]he public policy of Virginia is to uphold the validity of a marriage if at all possible."  *Id.*  at 857.

In sum, "[a]lthough common law marriages are void in Virginia if celebrated there, they will be recognized by Virginia if consummated in a state where valid and are between parties not forbidden to marry under Virginia law."  *Id.*  *Kelderhaus* acknowledges the same, and instructs courts to examine the relevant case law of the state at issue to determine whether the evidence supports a finding of a valid common-law marriage in that state.  In this case, the ALJ must determine whether a common-law union was formed under South Carolina case law.  If such a union is valid in a common-law jurisdiction, and would not otherwise be void in Virginia, *see* Va. Code Ann. § 20-38.1, it will be recognized by the state of Virginia.

### C.      Testimony of Plaintiff's Witnesses

Plaintiff alleges that the ALJ allowed only one witness at the hearing on June 23, 2016, implying that she was barred from introducing additional witnesses.  Pl.'s Mot. for Summ. J. at 3 (Dkt. No. 13); Pl.'s Mem. In Supp. at 17.  Specifically, Plaintiff alleges that, "[a]lthough not stated for the record, the ALJ's clerk entered the waiting room and instructed the plaintiff to choose one witness."  Pl.'s Mem. In Supp. at 24 (noting that her second witness, decedent's sister, "sat in the waiting room with the guard on duty").

By Plaintiff's own admission, nothing in the record corroborates her claim that the ALJ prevented the second witness from testifying.  There is no indication that Plaintiff ever sought to present a second witness, or even called the ALJ's attention to the fact that she had a second

witness seated in the waiting room.  Plaintiff asserted for the first time that Elizabeth Rigby Berry, Mr. Rigby's sister, "was shut out" of the hearing in argument to the appeals council. Tr. 148 (Ex. 34).  However, there does not appear to be a factual basis for Plaintiff's statement; for example, the record contains no ruling precluding Ms. Berry from testifying.[8]

More fundamentally, Plaintiff cannot allege error where she failed to appropriately preserve her rights through a contemporaneous objection and proffer of the evidence her witness would have presented had she been permitted to testify.  *See Branch v. Acting Comm'r of the United States*, Civil Action No. 17-cv-98, 2018 LEXIS 53051 (D.N.H. 2018) (noting that "nothing in the transcripts, ALJ's decision, or other records of the proceedings" verified claimant's allegation that the ALJ barred her witness from testifying, but that even if true, it did not appear from the record that claimant objected to the ALJ's ruling and therefore, any objection was waived).

Finally, Plaintiff argues that her "rights were disregarded" when only one witness was permitted to testify because the Code of Federal Regulations "requires two blood relatives['] statements as proof of the common law marriage."  Pl.'s Mem. In Supp. at 17.  This mischaracterizes the regulation, which lists types of "preferred evidence" of common-law marriages to include, if one party is deceased, "the signed statements of the one who is alive and those of two blood relatives of the deceased person."  C.F.R. § 404.726(b)(2).  This regulation does not require such statements, and certainly does not confer upon Plaintiff a right to have these witnesses testify at a hearing.

---

[8]     Although Plaintiff objected to a hearing by video teleconference, naming Ms. Rigby Berry and Harrison Rigby as two individuals who "want[] to attend" the hearing, *see* Tr. 110 (Ex. 24), she did not indicate then, or more importantly, at the hearing, that each would present testimony on her behalf.

For these reasons, the undersigned finds no evidence that the ALJ barred Ms. Berry from testifying and, in the alternative, finds that even if the ALJ did so, Plaintiff waived any objection by failing to raise the issue at the hearing.

## IV.   Recommendation

The undersigned finds that the ALJ failed to apply the proper standard when determining whether Plaintiff and decedent entered into a common-law marriage in South Carolina. Accordingly, the undersigned recommends:

GRANTING Plaintiff's Motion for Summary Judgment (Dkt. No. 14) and remanding the case for further administrative proceedings in accordance with the legal standards set forth herein. The undersigned further recommends

DENYING Defendant's Motion for Summary Judgment (Dkt. No. 15).

## V.   Notice

The parties are notified as follows. Objections to this Report and Recommendation must be filed within fourteen (14) days of service on you of this Report and Recommendation. Failure to file timely objections to this Report and Recommendation waives appellate review of the substance of the Report and Recommendation and waives appellate review of a judgment based on this Report and Recommendation.

/s/
Michael S. Nachmanoff
United States Magistrate Judge

August 30, 2018
Alexandria, Virginia